**L.C.D., Appellant,**

v.

**DISTRICT OF COLUMBIA ex rel. T.-A.H.D., Appellee.**

No. 83–1290.

District of Columbia Court of Appeals.

Argued Jan. 31, 1985.

Decided Feb. 25, 1985.

James McConville, Washington, D.C., for appellant.

William J. Earl, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before NEBEKER, FERREN, and BELSON, Associate Judges.

FERREN, Associate Judge:

█ In this appeal from a trial court finding of paternity, appellant challenges the court's admission into evidence of the results of a Human Leukocyte Antigen (HLA) test. He claims that the government did not lay a proper foundation for this evidence and that the trial court should have required the technician who conducted the test (under supervision of the expert who testified) to qualify as an expert herself and to testify regarding the procedures she followed. Finding no abuse of discretion, we affirm.[1]

## I.

Appellant met Ms. H., the mother of T.-A.H.D., in 1976 when they both were living in the same apartment building. They began to have a sexual relationship in November or December 1976, and appellant lived in Ms. H.'s apartment from January to July 1977.

Appellant and Ms. H. continued their relationship after he moved out of her apartment. Ms. H. testified that they had sexual relations every weekend in September and once during the first two weeks of October, and that she had sexual relations with no one else during the period between August and October 1977. Ms. H. further testified that appellant admitted to her that he might be the father of her child, although on deposition appellant denied having made such an admission.[2]

Appellant testified, both on deposition and at trial, that he had sexual relations with Ms. H. about two times in August 1977 but not thereafter. Appellant's testimony was rebutted by John W. Reed, a child support enforcement specialist with the Department of Human Services, who testified that during a September 1979 in-

---

1. Appellant also claims that the trial court's findings of fact regarding the critical period of conception were insufficient. At trial, the court took judicial notice of the critical period of conception for a child with T.-A.H.D.'s birthdate, expanding that period somewhat to accommodate the child's premature delivery, and found that "the critical period for conception was August 2, 1977 to October 3, 1977." Order, September 27, 1983, ¶ 2. The fact that T.-A.H.D.'s mother reported her last menstrual period before the child's birth to have occurred on September 12, 1977, makes it unlikely that conception took place before that date. However, the trial court had ample evidence of sexual access and contact between the mother and appellant after that date to support a finding of paternity. We find no error here.

2. There was also a conflict in testimony regarding whether appellant visited Ms. H. a few days before the birth of her child. Ms. H. asserted that such a visit took place. Appellant denied it.

terview, appellant acknowledged that his last sexual contact with Ms. H. had taken place on October 12, 1977. Donald King, a mutual friend of appellant and Ms. H., testified that he saw some of appellant's possessions in Ms. H.'s apartment during the fall of 1977, and that he never saw Ms. H. dating anyone else during that period.

At trial, the District called Dr. Norman C. Cramer as an expert witness. Cramer testified that the results of HLA tests performed at George Washington University (GWU) Medical Center on appellant, Ms. H., and the child, indicated that appellant was almost certainly the father of the child.[3]

## II.

■ This court held in *Cutchember v. Payne*, 466 A.2d 1240 (D.C.1983), that HLA test results do not come within the statutory prohibition of D.C.Code § 16–2343 (1981) and are therefore admissible in an action to determine paternity.[4] Appellant concedes the general admissibility of HLA test results but challenges their admission in this particular case.

Appellant argues, first, that the government did not lay a proper foundation for

admission of the test results into evidence. We disagree. At trial, Dr. Cramer, who performed the HLA analysis with a laboratory technician's assistance, identified himself as director of the Histocompatibility Typing Laboratory at GWU Medical Center. Both parties readily stipulated that he was an expert "in tissue typing and ... HLA testing for paternity." Cramer testified that his laboratory was fully accredited and qualified to perform and evaluate HLA tests.[5] He added that such tests to determine paternity regularly were conducted there.[6]

Dr. Cramer then gave a technical explanation of how an HLA test is done for paternity purposes, offering at one point to go into even further detail regarding the "actual mechanics" of the laboratory procedures. Appellant complains, nonetheless, that a chain of custody of the blood samples was not established. To the contrary, Dr. Cramer testified without contradiction as to the identification devices he used to safeguard the accuracy of the test results. This sufficed.

## III.

■ Appellant next complains that, because the blood samples were processed by

3. The HLA test reveals which antigens present in the child's white blood cells (leukocytes) were contributed by the father. Taking into account the statistical gene frequencies in appellant's racial group (American Indian), Dr. Cramer concluded that there was a greater than 99% likelihood that appellant had contributed the antigens at the loci tested, pointing to "an extremely likely paternity."

4. D.C.Code § 16–2343 (1981) provides that the results of "blood tests" may not be admitted in a paternity action over the objection of the putative father. *Cutchember* holds that HLA tests are not, properly speaking, "blood tests" and, moreover, that they are not characterized by the "dangers of statistical unreliability and undue prejudice" so as to come within the legislature's intent in drafting § 16–2343. 466 A.2d at 1242.

5. The Tissue Typing Laboratory at GWU Medical Center is accredited by the American Association of Clinical Histocompatibility Typing and by the Southeast Procurement Foundation; it is licensed under the Clinical Laboratories Improvement Act, 42 U.S.C. § 263a (1982) for the

performance of histocompatibility typing; and it is certified by the Center for Disease Control and by the Medicare In-State Tram Disease Program.

6. Dr. Cramer testified that the lab conducted HLA tests for paternity cases as frequently as four times a week, and that it had conducted approximately sixty such tests in the past six months. The fact that the HLA tests were performed in the regular course of the laboratory's business enhances the admissibility of the test results if all other prerequisites are satisfied. Super.Ct.Civ.R. 43–I provides for the admission into evidence of "[a]ny writing or record ... made as a memorandum or record of any act ... if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act ...." *Cf. Gass v. United States*, 135 U.S.App.D.C. 11, 14–16, 416 F.2d 767, 770–72 (1969) (slides made and analyzed in the regular course of hospital operations admissible under Federal Business Records Act, 28 U.S.C. § 1732, since deleted from Title 28 and replaced by Fed.R.Evid. 803(6).

Dr. Cramer's technician, Ms. Connally, she should have been qualified as an expert and testified at trial.[7]

According to *Gass v. United States*, 135 U.S.App.D.C. 11, 416 F.2d 767 (1969), there is a presumption of regularity applicable to hospital procedures performed under the auspices of an expert who testifies at trial. In *Gass*, a physician testified that the results of a gynecological examination of the complainant were compatible with rape. The slides of tissue smears taken from the complainant were admissible even though one link in the chain of custody was a nurse who did not testify at trial:

> [W]e do not think that calling the nurse as a witness was essential to the showing the government was required to make. The normal presumption that individuals entrusted with grave responsibilities discharge them with care "should apply a fortiori to doctors and nurses, whose professional training and traditions teach them to be meticulous." The record is bare of any indication that the nurse mishandled or tampered with the slides.... [T]he possibilities of misidentification and adulteration [must] be eliminated, not absolutely but as a matter of reasonable probability, and the evidence complies with that standard here.

135 U.S.App.D.C. at 14, 416 F.2d at 770 (citation and footnotes omitted).

The technician in the present case had as grave a responsibility as the nurse in *Gass*, given that the majority of HLA tests are performed in preparation for organ transplants and so are charged with life-and-death importance. Dr. Cramer was entitled reasonably to rely on the technician, and the court was entitled to give credence to Dr. Cramer's reliance, absent any allegation of technical irregularity or malfeasance. *See Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 367–68 (D.C.1980) (medical malpractice case; expert testimony properly received so long as based on fact or adequate data and not merely guess or conjecture); *Jenkins v. United States*, 113 U.S.App.D.C. 300, 304–05, 307 F.2d 637, 641–42 (1962) (opinion testimony based in part upon reports of others which are not in evidence but on which expert customarily relies is admissible).[8]

Although Dr. Cramer delegated some of the mechanical steps of the HLA testing to his technician, he testified that he "was present in the room during a good part of the entire procedure." Dr. Cramer performed important stages in this lengthy laboratory test either independently or simultaneously with his technician.[9] Fur-

---

**7.** We note that appellant did not call the technician to testify at trial, and that appellee expressed a willingness to summon this witness should the court require it.

**8.** Fᴇᴅ.R.Eᴠɪᴅ. 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Although the Federal Rules of Evidence have not been adopted in this jurisdiction, "Rule 703 is an expression of the law as it has developed here," and "[t]here is ample D.C. case authority for the proposition that experts may testify on the basis" of not only personal observation and evidence admitted at trial, but also "other sources relied upon in their fields or specialties." S.W. Gʀᴀᴀᴇ, Dɪsᴛʀɪᴄᴛ ᴏꜰ Cᴏʟᴜᴍʙɪᴀ Sᴛᴀᴛᴜᴛᴏʀʏ ᴀɴᴅ Cᴀsᴇ Lᴀᴡ Aɴɴᴏᴛᴀᴛᴇᴅ ᴛᴏ ᴛʜᴇ Fᴇᴅᴇʀᴀʟ Rᴜʟᴇs ᴏꜰ Eᴠɪᴅᴇɴᴄᴇ ¶ 7.9 (1976).

**9.** Dr. Cramer testified that the procedure of taking and labeling the three blood samples was "performed by Ms. Connally and myself." At two different points in his testimony—once taking pains to correct defense counsel—Dr. Cramer asserted that after the technician had performed mechanical steps, he derived the test results:

> No. That is not correct [that the technician gave him a final report]. Ms. Connally read the trays and scored the trays. At which time, I also read the trays and scored the trays and then together we decided on the antigen assignment for each individual ....
> Insofar as the reading and scoring of the individual wells on the individual trays, yes, we both read and scored the trays.

Dr. Cramer independently performed statistical analysis of the test results, a task requiring greater expertise.

thermore, Dr. Cramer testified that, at the time that these HLA tests were performed, he was serving not only as director of the lab but also as immediate supervisor; therefore, the trial court could assume that he closely monitored the technicians working under him.[10] Most importantly, Dr. Cramer testified that his signature on the HLA lab report "indicate[d] that those tests were performed according to [his] accepted standards in the laboratory," and declared his confidence in the test results:

> My signature on that paper means that I have reviewed the actual laboratory work as it was done and analyzed the data and did the determination of exclusion or inclusion for paternity.

The trial court has broad discretion in the matter of admission or exclusion of expert testimony. See *Taylor v. United States,* 451 A.2d 859, 866 (D.C.1982), *cert. denied,* 461 U.S. 936, 103 S.Ct. 2105, 77 L.Ed.2d 311 (1983); *Smith v. United States,* 389 A.2d 1356, 1358 (D.C.), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978). We note that defense counsel's objection to the admission of Dr. Cramer's testimony regarding the HLA test results was clearly articulated and fully aired at trial. The court took account of that objection in deciding that the delegation of "mechanical steps" to a technician did not warrant exclusion. Our independent review of the evidence leads us to sustain the trial court's admission of the test results as a responsible exercise of discretion. Dr. Cramer's expert testimony supplied the proper foundation for the HLA test results and was sufficient to vouch for the regularity of the testing procedures, without need for the subordinate technician to testify. *Gass,* 135 U.S.App.D.C. at 14, 416 F.2d at 770.[11]

## IV.

■ In any event, the court said at trial that the HLA test results were not crucial to its conclusion. The court incorporated that statement into its formal findings of fact: "it should be noted that the test results are not essential to a finding of paternity in this case." Order, September 27, 1983, ¶ 4. We may overturn the factual findings of a trial court sitting without a jury only if they are plainly wrong or without evidentiary support. D.C.Code § 17–305(a) (1981). We cannot say that the court was "plainly wrong" when it credited the testimony of Ms. H., Mr. King, and Mr. Reed over that of appellant. *See supra* Part I. Accordingly, even if the court had erred in admitting the HLA test results—and we hold that it did not—the error would have been harmless.

*Affirmed.*

---

**10.** About a month before Dr. Cramer performed these tests, his laboratory supervisor had resigned. Admittedly, this fact might be taken to show that Dr. Cramer was understaffed and less able than usual to direct his technicians, but it does not compel that conclusion.

**11.** Appellant relies on *Phillips v. Jackson,* 615 P.2d 1228 (Utah 1980), in which the Supreme Court of Utah considered both the general admissibility of HLA test results and the qualification and testimony of experts who performed the tests in that case. The court held that admission of the tests was prejudicial error, given inadequate expert testimony as to both issues. Appellant makes much of the fact that the technician who conducted the test did testify in *Phillips* and that the test results still were not admitted. The present case, however, is different: The general admissibility of HLA tests in paternity actions is conceded; and, in contrast with *Phillips,* there is a stipulated medical expert who testified both as to the general nature of the test and as to the performance and results of a particular test which the expert himself conducted, with the technician's assistance.