Diane R. GARVEY, et al., Appellants,

v.

J. Morgan O'DONOGHUE, M.D., et al., Appellees.

No. 84–1636.

District of Columbia Court of Appeals.

Argued Jan. 6, 1987.
Decided Sept. 9, 1987.

John McNally, for appellants. James E. Joyner, Washington, D.C., was on brief, for appellants.

Benjamin W. Glass III, with whom Joan E. Jennings and Brian C. Shevlin, Arlington, Va., were on brief, for appellees.

Before PRYOR, Chief Judge, and MACK and NEWMAN, Associate Judges.

PRYOR, Chief Judge:

This is an appeal from a jury verdict in favor of appellees against Diane R. Garvey and her husband, Vincent M. Garvey, in a medical malpractice suit alleging that Mrs. Garvey developed tinnitus[1] as a result of appellees' negligent prescription and administration of the antibiotic Tobramycin.[2] Appellants argue that the trial court made three erroneous evidentiary rulings of such magnitude that any one of the errors, but certainly all three taken together, constitutes reversible error. Specifically, appellants argue that (1) relevant portions of the Physicians' Desk Reference as well as the manufacturer's packaging inserts for the drug Tobramycin should have been admitted into evidence; (2) appellants' expert, who qualified as an expert in pharmacology, should have been allowed to testify as to the proper dosage and duration of treatment with the drug Tobramycin; and (3) the treating physicians' "diagnoses" of tinnitus contained in appellant Mrs. Garvey's medical records should have been admitted through appellants' medical expert. While we agree the trial court's evidentiary rulings were erroneous, in whole or in part as discussed *infra*, in light of the other evidence in the record before us, we find the errors to be harmless. Accordingly, we affirm.

I

In early March 1980, Diane Garvey, a first-year nursing student, sought medical treatment from Dr. J. Morgan O'Donoghue for a sore throat. Dr. O'Donoghue re-

---

1. Tinnitus is defined as "a subjective ringing or tinkling sound in the ear." TABER'S CYCLOPEDIC MEDICAL DICTIONARY (14th ed. 1981).

2. This action was commenced in March 1983, against J. Morgan O'Donoghue, M.D., Charles T. Gerber, M.D., Joseph W. Giere, M.D., and the President and Directors of Georgetown College.

Eli Lilly and Company was added as a defendant in June 1983, by way of amendment to the complaint. Prior to trial, action as to the defendants President and Directors of Georgetown College and Eli Lilly and Company was dismissed.

ferred her to Dr. Gary Burch, an ear, nose, and throat specialist, who diagnosed her condition as a strep infection. On March 11, 1980, because her symptoms had not improved, Mrs. Garvey was admitted to Georgetown University Hospital complaining of a severe sore throat, severe abdominal tenderness, and high fever. During the first full day after her admission, Mrs. Garvey's temperature rose to 104.7 degrees Fahrenheit.

While hospitalized, Mrs. Garvey was under the care of several physicians, including Dr. J. Morgan O'Donoghue, an internist, Dr. Charles T. Gerber, a specialist in obstetrics and gynecology, and Dr. Joseph W. Giere, Mrs. Garvey's obstetrician and gynecologist since 1975, all appellees in this case. Her doctors determined she was suffering from a left tubo-ovarian abscess seven centimeters in size. This diagnosis was later confirmed by sonography.

Throat and vaginal cultures taken around the time of Mrs. Garvey's admission to the hospital indicated that several antibiotics, including Tobramycin, would be effective against the offending organism, Beta Streptococcus Group A. Two potent antibiotics, Tobramycin (Nebcin-Lilly) and Cefoxiitin (Mefoxin-MSD) were administered intravenously for fourteen days; Tobramycin was administered in an initial dose of 80 mg. followed by 60 mg. every eight hours for the remaining thirteen days of Mrs. Garvey's hospitalization. During this time, Mrs. Garvey showed steady improvement. Blood tests were conducted at least twice to monitor for side effects from the antibiotic; however, the last monitoring

was conducted eight days before administration of the drug was concluded. At no time during her hospitalization did Mrs. Garvey complain of hearing loss, hearing impairment, or unusual sounds in her ears. She was released from the hospital on March 27, 1980.

Mrs. Garvey testified she first noticed a "sound" in her ears a few weeks after being discharged from the hospital, but could not recall with certainty mentioning it to any physician before February 1981 when she told Dr. Giere.[3] She was examined and treated by two ear, nose, and throat specialists, neither of whom testified at trial. The only evidence presented at trial that Mrs. Garvey suffered from tinnitus was her own testimony and that of her expert medical witness. She tried several methods of minimizing or covering the distracting sound including playing a radio at night, leaving the television on, and finally purchasing a "tinnitus masker" in the summer of 1984.

At trial, Mrs. Garvey sought to show that Tobramycin is a highly toxic drug and that more suitable, less dangerous drugs were available. In addition, she attempted to show that both the dosage level and the duration of treatment with the drug exceeded the recommended standards for a person of her size.

Appellants presented the testimony of two expert witnesses. The first was Nicholas Criares, M.D., a board certified obstetrician and gynecologist, who had been employed since 1978 by the State of New

3. The record before us contains some indication that Mrs. Garvey had had previous medical problems with her ears. For example, Dr. O'Donoghue's record of Mrs. Garvey's March 27, 1979 office visit refers to "tinnitus." This record was admitted into evidence. Moreover, at trial Mrs. Garvey would not deny that she had suffered ear and hearing disorders prior to her exposure to Tobramycin.

Q. On February 14th [1978], did you ever complain to any physician that you had a sea shell sound in your ears and that you were unsteady?
A. I don't recall.
Q. If you don't recall that, let me see if I can refresh your recollection a little more. On February 14th, 1978, did you ever com-

plain of any discharges from one of your ears and see a physician for it?
A. I don't remember. I remember I had medicine from Dr. Burch once, when I had a sore throat and some pressure had built up in my ears from the sore throat [sic] of this sea shell type of sound.
*  *  *  *  *  *
Q. I am not concerned about your strep throat, Mrs. Garvey, I am concerned about whether or not you saw Dr. Bahr for ear problems, specifically sea shell sounds, unsteadiness on your feet, discharge from your ear, and a question was made then or raised then of tinnitus?
A. No, I don't recall that. I am not denying it, I am saying that I don't recall it.

York and served at the Bronx Psychiatric Center. Dr. Criares indicated that he had last performed gynecological surgery sometime between 1976 and 1978 and that he had never prescribed Tobramycin to a patient. Dr. Criares was qualified as an expert in the field of obstetrics and gynecology and in the treatment of gynecological diseases, specifically with antibiotic therapy.

Appellants' second expert was Linwood Tice, D.Sc., a retired Dean of the Philadelphia College of Pharmacy, where he had taught various subjects including chemistry and pharmacology from 1938 through his tenure as dean until his retirement in 1975. During his career, Dr. Tice engaged in clinical research on aminoglycosides, the group of drugs to which Tobramycin belongs. He retired two years before Tobramycin was placed on the commercial market. Dr. Tice was qualified by the court as an expert in pharmacology.

Both Dr. Criares and Dr. Tice had reviewed Mrs. Garvey's medical records. Both experts testified that Tobramycin belongs to a group of drugs called aminoglycosides which have well-known nephrotoxic and ototoxic properties; that is, use of the drug in too high a dosage or over an extended period of time can cause kidney damage that is reversible and damage to the eighth cranial nerve (affecting hearing) that is irreversible. The ototoxicity of Tobramycin manifests itself in a variety of ways including hearing loss and ringing in the ears. Both experts testified that appropriate dosage is a function of the weight and renal health of the patient, that use of the drug should not exceed ten days, and that the patient should be monitored to detect signs of nephrotoxicity and ototoxicity. Dr. Criares stated that in his opinion the proper standard of care for treatment of a tubo-ovarian abscess is antibiotic ther-

apy, but that because Mrs. Garvey's condition was not life-threatening, Tobramycin was not the appropriate antibiotic to use. In addition, Dr. Criares testified that in his opinion Mrs. Garvey suffered from tinnitus caused by the improper administration of Tobramycin while under the care of appellees.

## II

### A.

At trial, appellants made repeated attempts to introduce into evidence both the pages of the Physicians' Desk Reference (PDR) dealing with the drug Tobramycin and the drug manufacturer's package insert on Tobramycin.[4] Although appellants' experts, Dr. Criares and Dr. Tice, were allowed to make specific reference to the PDR, the trial court refused to place either document before the jury, finding that each was inadmissible hearsay. On appeal, appellants provide three arguments in the alternative for the admissibility of both documents. We treat each argument separately.

Appellants first contend that the documents are admissible as data reasonably relied upon by experts in forming their opinions. In general, an expert witness may testify on the basis of data that is not itself admissible if the data is of a type reasonably relied upon by experts in the particular field in forming their opinions or inferences on the subject. FED.R.EVID. 703; *L.C.D. v. District of Columbia ex rel. T.-A.H.D.*, 488 A.2d 918, 921 n. 8 (D.C.1985). It is clear, then, that the PDR and the package insert pertaining to Tobramycin may be used as a basis for expert testimony if the expert relied on them in forming an opinion. If, however, the evidence is proffered, only as a basis for expert testi-

4. The Physicians' Desk Reference is an annual publication compiling product information about pharmaceuticals. The information is provided by the drug manufacturers and is approved by the FDA. Each year the PDR and its supplements are sent free of charge to licensed physicians in the United States and abroad. A typical entry includes the trade name and chemical name of the drug, a description of the drug,

indications and contraindications for its use, warnings, adverse reactions, administration and dosage, and information on managing and adjusting the dosage of the drug. At issue in this case is the admissibility of pages 1064–66 of the 1980 edition. As conceded by all, the package insert for Tobramycin is virtually an exact copy of the information about Tobramycin as it appears in the PDR.

mony, the document itself is not admissible. FED.R.EVID. 703. In this instance, although both experts indicated they did review the PDR in preparing their testimony, the record before us is unclear as to whether either relied on the PDR in reaching an opinion.

■ Appellant next argues that the PDR can be characterized as a publication prepared for and relied upon by physicians and pharmacologists and is, therefore, admissible as an exception to the hearsay rule. FED.R.EVID. 803(17).[5] Typically the publications covered by this exception to the hearsay rule are lists containing readily verifiable information such as telephone directories, price lists and the like. This exception is recognized in this jurisdiction. *Kanelos v. Kettler,* 132 U.S.App.D.C. 133, 406 F.2d 951 (1968) (mortality tables admissible as evidence of life expectancy); *Reilly v. Cullinane,* 53 App.D.C. 17, 287 F. 994 (1923) (same).[6] In the instance of the PDR, interwoven among its factual statements are statements that correctly can be classified as directions, opinions, suggestions, and recommendations. Thus, it would be error to receive such as evidence, on that basis, of the truth of the matters asserted there-

in. *Rosario v. New York City Health & Hospital Corp.,* 87 A.D.2d 211, 450 N.Y. S.2d 805 (1982), *cited with approval by Spotts v. Reidell,* 345 Pa.Super. 37, 497 A.2d 630 (1985), *appeal denied,* (1986) (injection of Sotradecol).

Finally, appellant argues that regardless of whether the PDR is admissible for the truth of the information contained therein, it is admissible as evidence of the applicable standard of care for administration of Tobramycin and as evidence that appellees knew or should have known about the recommended indications, contraindications, side effects, warnings, and dosage levels of Tobramycin. On this issue, the case law is unsettled. Although this court has not previously addressed the question, some courts have held that relevant package inserts or references from the PDR, accompanied by expert testimony, have a bearing on the standard of care or the defendant physician's notice of the drug's side effects.[7]

■ Generally, the PDR "is not conclusive evidence of the standard or accepted practice in the use of the drug by physicians and surgeons, nor that a departure from such directions is negligent. But it is

---

**5.** FED.R.EVID. 803(17) provides: "Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations" are not excluded by the hearsay rule regardless of the availability of the declarant.

**6.** Appellant directs our attention to *SK & F v. Premo Pharmaceutical Laboratories,* 481 F.Supp. 1184, 1189 (D.N.J.1979), *aff'd,* 625 F.2d 1055 (3d Cir.1980) for a specific holding that the PDR falls within the ambit of FED.R.EVID. 803(17). In *SK & F v. Premo Pharmaceutical Laboratories,* plaintiff alleged patent infringement, unfair competition, and introduction into commerce of a false designation of origin or false description or representation in violation of the Lanham Act. We find that case unhelpful since there the drug package insert was admitted to show that defendant's generic drug was being marketed in confusingly similar trade dress to plaintiff's nongeneric drug.

**7.** *See, e.g., Salgo v. Leland Stanford University Board of Trustees,* 317 P.2d 170, 180, 154 Cal. App.2d 560, 576 (1957) (package inserts admissible as evidence of the standard of care); *Julien v. Barker,* 272 P.2d 718, 724, 75 Idaho 413, 422 (1954) (same); *Rodriguez v. Jackson,* 574 P.2d

481, 486, 118 Ariz. 13, 18 (1977) (same); *Mueller v. Mueller,* 221 N.W.2d 39, 43, 88 S.D. 446, 453 (1974) ("these manufacturer's recommendations on the use of drugs are not only admissible but essential in determining the possible lack of care of a doctor where the issue involved is injury from the administration of a drug"); *Haven v. Randolph,* 342 F.Supp. 538, 542–43 (D.D. C.1972), *aff'd,* 161 U.S.App.D.C. 150, 494 F.2d 1069 (1974) (relevant package inserts admissible, but if they do not "provide any insight into what might constitute the standard of care" and are unaccompanied by expert medical testimony, they are insufficient to establish a standard of care); *Sanzari v. Rosenfeld,* 167 A.2d 625, 630, 34 N.J. 128, 139 (1961) (package insert admissible as evidence of physician's notice of side effects). In addition, package inserts have been admitted as evidence of adequacy of warning in products liability cases against drug manufacturers. *See, e.g., Stafford v. Nipp,* 502 So.2d 702 (Ala.1987). At least one court has held that the medical standard for administration of a drug may be established by the PDR alone, independent of any expert medical testimony. *Haught v. Maceluch,* 681 F.2d 291, 303 n. 12, *reh'g denied,* 685 F.2d 1385 (5th Cir.1982).

*prima facie* proof of a proper method of use, given by the maker which must be presumed qualified to give directions for its use and warnings of any danger inherent therein." *Julien v. Barker, supra* note 7, 272 P.2d at 724, 75 Idaho at 422. At least one court closer to home has similarly characterized the admissibility of the PDR and package inserts, stating that "[t]he package insert ... does not standing alone establish a standard of care, but rather, *prima facie* proof of proper use...." *Nolan v. Dillon,* 276 A.2d 36, 49, 261 Md. 516, 540 (1971) (intravenous injection of Sparine). "[W]hile admissible, [the PDR] cannot establish as a matter of law the standard of care required of a physician in the use of the drug." *Salgo v. Leland Stanford University Board of Trustees, supra* note 7, 317 P.2d at 180, 154 Cal.App.2d at 576. When the package insert or the PDR is offered in conjunction with expert testimony, however, that combination may be sufficient to establish the standard of care. *Riffey v. Tonder,* 375 A.2d 1138, 1148, 36 Md.App. 633, 652 (1977) (use of Dextran in treatment of thrombophlebitis).[8]

We adopt this approach, and we hold that the applicable pages of the Physicians' Desk Reference and the package insert for the antibiotic Tobramycin are relevant and probative evidence of the medical standard of care for selecting, administering, and monitoring the drug. Further, in a medical malpractice case alleging improper administration, dosage, and monitoring of the drug, they are admissible as both *prima facie* evidence of the standard of care and physicians' notice of their contents. The trial court, therefore, erred in excluding these documents.

### B.

As their second assignment of error, appellants contend that the trial court improperly limited the testimony of Dr. Linwood Tice. Dr. Tice was qualified by the court as an expert in the field of pharmacology, but was not permitted to testify about the proper or excessive dosage of Tobramycin, and whether Tobramycin was properly prescribed to Mrs. Garvey. In restricting Dr. Tice's testimony, the court reasoned that to allow him to testify as requested would be tantamount to allowing a nonmedical expert to testify to a medical standard of care.

"In a medical malpractice case the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached that standard, and that the breach was a proximate cause of the plaintiff's injuries." *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619 (D.C. 1986); *Crain v. Allison,* 443 A.2d 558 (D.C. 1982). The decision to admit expert testimony lies within the sound discretion of the trial judge, whose ruling will be sustained unless clear abuse of discretion is shown. *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712 (D.C.1985) (testimony of industrial psychologist excluded since jury capable of making common sense determination required); *Hughs v. Pender,* 391 A.2d 259 (D.C.1978). Although the causes of action that require expert testimony are "rare," *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962), it is generally true that "expert testimony is required when the subject presented is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *Payne v. Soft Sheen Products, Inc., supra,* 486 A.2d at 727 n. 17; *District of Columbia v. Barriteau,* 399 A.2d 563 (D.C.1979).

Traditionally, a physician's standard of care may only be established by medical testimony and "medical testimony" means "testimony by physicians." *Rodriguez v. Jackson, supra* note 7, 574 P.2d at 485, 118 Ariz. at 17. In contrast, some courts have held that a nonphysician may testify as to the standard of care due by a physician. *Pratt v. Stein,* 444 A.2d 674, 298 Pa.Super.

---

**8.** *See also Witherell v. Weimer,* 101 Ill.Dec. 679, 685, 499 N.E.2d 46, 52, 148 Ill.App.3d 32, 40, *appeal allowed,* 106 Ill.Dec. 58, 505 N.E.2d 364, 113 Ill.2d 586 (1986) (PDR in conjunction with expert testimony may be used to established *the* standard of care; PDR used alone establishes only *a* standard of care).

92 (1982) (pharmacologist may testify as to standard of care in case involving irrigation of wound with neomycin causing ototoxicity); *Kubrick v. United States*, 435 F.Supp. 166 (E.D.Pa.1977), *aff'd*, 581 F.2d 1092 (3d Cir.1978), *rev'd on other grounds*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). *Pratt* and *Kubrick* are instructive since in both cases, as here, an expert witness was qualified by the court to offer pharmacological testimony in a medical malpractice case alleging the improper use of an antibiotic. In *Pratt*, the court stated that the primary focus of the pharmacologist's testimony "was that neomycin was known to be a highly toxic antibiotic, that there were other, safer drugs that could have been used in treating appellee, and *that the dosage and manner in which the neomycin was administered was below the standard of reasonable medical care.*" *Pratt v. Stein, supra,* 444 A.2d at 706, 298 Pa.Super. at 153 (emphasis added). The court expressly recognized that pharmacology is "the study of various medications, their origin, nature, properties, and effects upon living organisms" and that being neither a surgeon nor experienced in the day-to-day treatment of post-operative infections is not sufficient to block testimony by a pharmacologist about the drug itself. *Id.*

The border between what is peculiarly the province of medical doctors and that of pharmacologists or other professionals whose fields of expertise are closely related to the medical profession, has not, and we think cannot, be drawn with precision.[9] The close relationship between medicine and the other health care professions mandates a tolerance for imprecision in the dividing line between who may and who may not testify as to the standard of care due by a physician to his patient.

Such tolerance is particularly appropriate where the allegation is that a physician breached a duty of care by incorrectly using a product, device, or equipment. *See, e.g., Monk v. Doctors Hospital,* 131 U.S.App.D.C. 174, 176, 403 F.2d 580, 582 (1968) (manuals describing use of "Bovie" electrosurgical machine admissible on standard of care). Physicians, because they are not expert in pharmacology, acquire knowledge of drugs by personal experience or through reliance on the work of pharmacologists, pharmacists, and others in related fields. It seems clear, then, that to the extent physicians do rely on a body of pharmacological information, the expertise of a pharmacologist is virtually indistinguishable from that of the physician. Since physicians rely upon information that originates with or is provided by the practitioners in another field, here pharmacologists, this reliance opens the door for these nonphysicians to testify as to that body of information. In effect, where a physician "borrows" a standard of care from the research and work of other professionals, members of that profession may testify about it.

Thus, we hold that the trial court erred in refusing to allow Dr. Tice to testify as to the effects of Tobramycin on Mrs. Garvey, the proper dosage of Tobramycin for a person of Mrs. Garvey's size, and the propriety of monitoring the drug's effects through the use of blood tests.

### C.

Appellants' third challenge is that the trial court improperly excluded one set of medical records created by treating physician George T. Nager, M.D., and improper-

9. *See, e.g., Gideon v. Johns-Manville Sales Corp.,* 761 F.2d 1129 (5th Cir.1985) (no abuse of discretion to permit a biostatistician and epidemiologist who is not a medical doctor to testify as to the toxic effects of inhaling asbestos, the risk of cancer and the reduced life expectancy associated with asbestosis); *Jenkins v. United States,* 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (en banc) (nonphysician psychologist without "medical training" or license to treat conditions he describes may testify as to mental disease of criminal defendant). "[I]f experience or training enables a proffered expert witness to form an opinion which would aid the jury, in the absence of some counterveiling consideration, his testimony will be received." *Id.,* 113 U.S.App. D.C. at 307, 307 F.2d at 644. *See also Witherell v. Weimer, supra,* 101 Ill.Dec. at 685, 499 N.E.2d at 52, 148 Ill.App.3d at 143 (pharmacologist with M.D. degree but not licensed to practice medicine in any state not incompetent to establish standard of care in medical malpractice case based on improper prescription of drugs).

ly redacted references to tinnitus from another set of medical records created by treating physician Gary Burch, M.D. Neither physician was a defendant or witness in this case. Rather, appellants sought to admit the records through their OB/GYN expert, Dr. Criares. We treat each ruling in turn.

■■■ The document created by Dr. Nager is a two-page chartlike report of the results of Mrs. Garvey's October 13, 1982 and July 25, 1984 hearing examinations at the Hearing and Speech Clinic of Johns Hopkins Hospital. In addition to test results, the document contains the two hand-written comments: "Hx: Bilateral tinnitus; ... for the past 2½ years following [phenocomycin] Rx," and "[T]he patient reports bilateral tinnitus." The record reveals that the tests themselves showed no abnormalities in Mrs. Garvey's hearing. The court ultimately excluded the entire document. We conclude that the statements are neither medical opinion nor medical diagnosis by the treating physician, and that the statements are unrelated to the actual hearing test results. We hold that it was improper to exclude the entire document, and that it would have been sufficient to redact the references to tinnitus and admit the hearing examination results. This is especially so, since on the record before us, Dr. Nager refused to testify to a reasonable degree of medical certainty that Mrs. Garvey had tinnitus at all, much less that such alleged tinnitus resulted from the administration of Tobramycin between March 11 and March 27, 1980.

The medical records prepared by Dr. Burch also contain references to tinnitus. Here, however, the references are diagnoses rather than mere recordings of Mrs. Garvey's presenting complaints. The court ordered the references to tinnitus redacted on the grounds that Dr. Burch was not a witness and could not be cross-examined. As appellant points out, the document entries, even if inadmissible hearsay, in some circumstances may be admissible as the basis of expert testimony.

Both Dr. Burch and Dr. Nager were available to testify; in fact, Dr. Nager was listed in appellants' pretrial statement as one of three expert witnesses appellants expected to call at trial. Still, appellants elected not to call either physician as a witness. Given the nature of the offending statements, the only possible proper use of them by appellants' expert, Dr. Criares, would have been to establish that Mrs. Garvey was examined by the doctors and that Mrs. Garvey told the doctors she suffered from tinnitus. We hold, therefore, that the court did not abuse its discretion by ordering a portion of the patient's medical record redacted. To allow the reference to tinnitus before the jury would have amounted to admitting two additional expert opinions on an ultimate issue in the case without benefit of cross-examination on the issue. Cross-examination of the treating physicians was particularly crucial here since Dr. Burch and Dr. Nager were not willing to support a diagnosis of tinnitus at trial.

### III

■■■ While we agree with appellants' arguments as indicated, *supra*, II A.–C., we observe that "[w]hen reviewing such rulings, this court will ... reverse only if a party's substantial rights are affected." *Pyne v. Jamaica Nutrition Holdings, Ltd.*, 497 A.2d 118 (D.C.1985). "[I]f one cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

On the record before us, we conclude that the trial court's erroneous evidentiary rulings do not warrant reversal. Prejudice arising from the exclusion of evidence may be mitigated where the same information or very nearly the same information is placed before the jury through another witness or in a different form. *Boyle v. Smith*, 64 A.2d 428 (D.C.1949). Here, appellants' medical expert, Dr. Criares, testified as to the side effects, proper dosage,

duration of treatment, and monitoring of the drug Tobramycin, and in so doing frequently made reference to the PDR; his testimony thereby overlapped with the actual testimony and most, if not all, of the proffered testimony of appellants' pharmacological expert, Dr. Tice. Further, appellants' experts' testimony in combination covered the points contained in the PDR and package insert, rendering the exclusion of those documents harmless.

We also note that the exclusion of the medical records of Dr. Nager was harmless, because it would have been appropriate to redact the references to tinnitus contained in them and because the remaining hearing examination results merely showed normal hearing functions.

*Affirmed.*

NEWMAN, Associate Judge, dissenting:

I agree with the conclusion reached by the majority, in Parts A and B of its opinion, that the trial court erred both in excluding from evidence the Physicians' Desk Reference and package insert for Tobramycin, and in improperly limiting the testimony of Garvey's pharmacology expert, Dr. Tice. Although I also agree with its conclusion in Part C that the trial court properly ordered redaction of the diagnoses of tinnitus contained in the treating physicians' reports, I am of the opinion that the court erred in preventing Garvey's OB/GYN expert, Dr. Criares, from mentioning these diagnoses during his own testimony, a ruling which the majority does not discuss. More fundamentally, I think the erroneous evidentiary rulings here went to the heart of the standard of care issue, and very nearly eviscerated Garvey's case; I do not, therefore, share the majority's confidence that the judgment of the jury was not swayed by the errors. I would not find these errors harmless.

## I

With regard first to the reports of Drs. Nager and Burch, two non-testifying physi-

cians who had treated Garvey, these reports were offered in evidence by Garvey as records relied upon by her expert, Dr. Criares, in formulating his expert opinion.[1] The court excluded Dr. Nager's report entirely, and ordered Garvey to redact from Dr. Burch's reports any diagnoses of tinnitus contained therein. The court reasoned that these diagnoses amounted to independent expert opinions on what was one of the ultimate issues of the lawsuit, and should not be presented to the jury without being subjected to cross-examination. The court also ordered Garvey's counsel to instruct Dr. Criares not to make mention during his testimony of the other physicians' diagnoses which the court had ordered excluded or redacted from the records.

The proffered purpose of offering the treating physicians' diagnoses was to "test the validity of the basis upon which ... [Dr. Criares'] expert opinion rests," *Smith v. United States,* 318 A.2d 891, 893 (D.C. 1974), rather than as substantive proof that Garvey had tinnitus. Although a contrary ruling would have been sustainable in my view, I cannot say that the trial court erred in concluding that sending these diagnoses to the jury room would sever their connection with Dr. Criares' testimony, upon which he could be cross-examined. The trial court could properly conclude that even with limiting instructions, the jury would likely view these diagnoses in the jury room as additional independent diagnoses of tinnitus, equal in weight to that of Dr. Criares. As such they would become conclusions unattached to expert testimony and not subject to cross-examination. *Cf.* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(18)[02], at 803.329–330 (1985) (explaining why under FED.R.EVID. 803(18), learned treatises may only be read into evidence). With regard to the deletion of these diagnoses from the medical records, then, I share the majority's view that the trial court did not err in concluding that the jury should not have before it what "would

---

1. It appears that Drs. Nager and Burch were not called to testify for Garvey because they would not say with a reasonable degree of medical certainty that she had tinnitus or, if she did, that it was caused by the Tobramycin.

have amounted to admitting two additional expert opinions on an ultimate issue of the case without benefit of cross-examination on the issue." Maj.Op. at 1148.

However, the rationale for deleting the diagnoses from the medical records did not justify the court's order that Dr. Criares not mention the diagnoses during his testimony. The majority does not address this ruling, which is, in my view, erroneous. The law of this jurisdiction clearly allows the expert to base his opinion on reports not in evidence, if of a type customarily relied upon in the practice of his profession. *L.C.D. v. District of Columbia ex rel. T.-A.H.D.*, 488 A.2d 918, 921 n. 8 (D.C. 1985); Fed.R.Evid. 703; *Jenkins v. United States*, 113 U.S.App.D.C. 300, 304–05, 307 F.2d 637, 641–42 (1962) (en banc). The expert may disclose, explain, and be questioned upon those reports. *Smith, supra*, 318 A.2d at 893; *Brown v. United States*, 126 U.S.App.D.C. 134, 142, 375 F.2d 310, 318 (1966), *cert. denied*, 388 U.S. 915, 87 S.Ct. 2133, 19 L.Ed.2d 1359 (1967); *Smith v. United States*, 122 U.S.App.D.C. 300, 304–05 & n. 7, 353 F.2d 838, 842–43 & n. 7 (1965), *cert. denied*, 384 U.S. 974, 86 S.Ct. 1867, 16 L.Ed.2d 684 (1966); *see also United States v. Sims*, 514 F.2d 147, 148 & 149–50 (9th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 83, 46 L.Ed.2d 66 (1975); S. Saltzburg & K. Redden, *Federal Rules of Evidence Manual* 671 (4th ed. 1986).[2] Such evidence is not admissible for its truth, but rather to explain the basis for the expert opinion. *Smith, supra*, 122 U.S. App.D.C. at 303 n. 4 & 304–05, 353 F.2d at 841 n. 4 & 842–43; *Sims, supra*, 514 F.2d at 149–50; Saltzburg & Redden, *supra*, at 671.

Physicians habitually rely upon the diagnoses of other physicians in making their own diagnoses and/or treating their patients. In *Smith, supra*, 318 A.2d at 893, the government's expert psychologist testified as to a diagnosis similar to his own

made by other hospital staff at a staff conference which the expert had not attended. The appellant alleged that conclusional psychiatric opinions were inadmissible when the person rendering the opinion is not present for cross-examination. Though there, as here, the other staff's diagnosis concerned the ultimate issue to be decided (in that case, insanity), we indicated, citing the federal circuit court decisions in *Brown*, *Smith*, and *Jenkins, supra*, that admission of this testimony was proper.

Dr. Criares should have been permitted to testify as to the diagnoses contained in the treating physicians' reports.[3] The fact that the non-testifying doctors had since changed their opinions was not a basis for excluding this testimony; defendants could have made this fact known through cross-examination of Dr. Criares, or by calling these doctors to testify as witnesses on defendants' own behalf.

## II

My more fundamental disagreement with the majority concerns its assessment of the effect of the erroneous evidentiary rulings upon Garvey's substantial rights. D.C. Code § 11–721(e) (1981); *Giles v. United States*, 432 A.2d 739, 746 (D.C.1981). In my view, the majority has mistaken the degree to which the information erroneously excluded by the trial court was "placed before the jury through another witness or in a different form." Maj.Op. at 1148.

The PDR and package insert contained detailed information on the recommended dosage, monitoring, duration of treatment, contraindications, and side-effects of Tobramycin, information "not only admissible but essential" to determining the standard of care in the use of the drug. *Mueller v. Mueller*, 88 S.D. 446, 221 N.W.2d 39, 43 (1974). The jury was not permitted to see the manufacturer's information. The ma-

---

2. In *Smith, supra*, 122 U.S.App.D.C. at 303, 353 F.2d at 841, the circuit court permitted a portion of a psychiatric report relied upon by an expert to be read into evidence.

3. A limiting instruction would have been appropriate to explain to the jury that this evidence was admitted to explain the basis of the expert's opinion, not as substantive evidence of tinnitus. *Sims, supra*, 514 F.2d at 149–50; Saltzburg & Redden, *supra*, at 671.

jority suggests that this information was substantially presented to the jury through Garvey's other experts. I disagree.

Dr. Tice, though permitted to describe what the PDR and package inserts are, how they are compiled or produced, and the *type* of information contained in them, was never in any way permitted to testify directly as to the actual information contained in the PDR and package insert about Tobramycin. The majority is perhaps comforted by the fact that Dr. Tice, near the end of his testimony, answered generally that the PDR contained information about which he had testified. I find this indirect, non-specific reference to the information contained in the PDR a very poor substitute for the document itself. Besides, the majority itself concedes that the information about which Dr. Tice testified was itself severely restricted by the trial court, omitting such essential information as the proper dosage of the drug, its side-effects and the propriety of monitoring the drug's effects through the use of blood tests. Maj. Op. at 1147; *see infra* at 1152.

Neither did the information contained in the PDR and package insert come in through the testimony of Dr. Gerber, Garvey's third witness (and also one of the defendants). Dr. Gerber was permitted to testify only that the PDR and package insert provide information about recommended dosage and duration of treatment; at no time did he testify as to what that information actually was. Garvey's attempt to elicit such testimony was objected to, and the objection sustained.

The actual information contained in the PDR and package insert came in only through Dr. Criares.[4] Dr. Criares was a manifestly weak expert witness.[5] Of course, Garvey was not entitled to have a star expert witness. But she *was* entitled to have the manufacturer's data entered into evidence, and its exclusion was error. We "must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Dr. Criares' inadequacy as a witness is an aspect of the total setting of the record which must be considered. Had the PDR and insert been entered in evidence as they should by rights have been, the jury would have had before it strong evidence of standard of care in the administration of Tobramycin, undiminished by Dr. Criares' ineffectiveness as a witness. The independent evidence of standard of care would, in turn, have lent authority to Dr. Criares' opinion that Garvey was treated negligently. Even if these materials were not admitted, allowing Dr. Tice to testify about their contents would similarly have aided Garvey on the standard of care issue and bolstered Dr. Criare's opinions; but, of course, Dr. Tice was silenced on the PDR and package insert as well. *See supra* at 1150.

Garvey was entitled to show the jury in black and white the manufacturer's data on the drug, information which was *prima facie* evidence of the proper standard of care. *See* Maj.Op. at 1145–1146 and cases cited.[6] Instead, as a result of the trial

---

**4.** Dr. Criares briefly testified as to the possible side-effects of Tobramycin described in the PDR and package insert, and the proper dosage and duration of treatment recommended therein. However, he never testified about the PDR's warnings as to monitoring, an important issue in the case. (Garvey contended that she received only two blood tests, the last being eight days prior to the termination of her 14–day treatment.)

**5.** In his voir dire conducted in the presence of the jury, Dr. Criares stated that although employed at a psychiatric institution in Bronx, New York where he administered gynecological and obstetrical care to institutionalized patients, he had not delivered a baby, performed surgery,

or admitted any patient to a hospital for the past six to eight years. He could identify no text in his office to which he referred. He could not, without the help of cross-examining counsel, name any of the aminoglycosides, the genre of drug to which Tobramycin belongs. He had no specialized training in infectious diseases, one area of expertise for which he was offered as an expert. Ruling that he was qualified as an expert witness, the trial judge nevertheless stated that Dr. Criares had the "bare minimum" of credentials.

**6.** The jury itself felt a need for this information, as evidenced by its note to the trial judge, during the course of its deliberations, requesting a copy of the PDR reference on Tobramycin and

court's rulings, this information was presented only indirectly, briefly, and incompletely to the jury, in a manner bounded by the credibility of a hired expert with the "bare minimum" of credentials.

The negative effects of the PDR/package insert rulings on Garvey's ability to establish the standard of care were compounded by other rulings as to Dr. Tice's testimony. Perhaps the jury's inability to see the manufacturer's information, or hear it through the mouth of Dr. Tice, might have been compensated for had Dr. Tice been permitted to testify from his *own* knowledge as to the proper standard of care in the administration of the drug. He was allowed to testify about its possible side effects and the proper frequency of monitoring; but in a series of erroneous rulings, his proffered testimony as to the most important issues—indications for the use of Tobramycin, proper dosage and duration of treatment, the propriety of monitoring treatment through blood tests, and the effects of the drug on Garvey—was consistently excluded. *See* Maj.Op. at 1147.

In short, the erroneous evidentiary rulings had the effect of substantially depriving the jury of the testimony of one expert (Dr. Tice) on the proper standard of care, and entirely removing from it independent evidence of standard of care which Garvey was entitled to put before it (the PDR and package insert). Garvey's evidence on the proper administration of the drug was thus reduced to a few minutes of testimony by a weak witness with no independent support.

When one further considers the exclusion from evidence of a treating physician's diagnosis of tinnitus, it seems that the trial court could not have done more to debilitate Garvey's expert testimony. The jury should have been permitted this information to test the bases of Dr. Criares' opinions. *See supra* at 1150. The concurring diagnosis of a physician who had actually treated Garvey would have lent a firmer basis to Dr. Criares' opinions.

the package insert. The court instructed the jury that it could not provide them with materi-

In my opinion, this is a case in which it is impossible to say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248. *I would reverse and remand for a new trial.*

al which had not been admitted in evidence.