745 N.W.2d 898 (2008)
275 Neb. 238
Collette THONE and Anthony Thone, Appellants,
v.
REGIONAL WEST MEDICAL CENTER et al., Appellees.
No. S-05-1556.
Supreme Court of Nebraska.
March 14, 2008.
*901 Brian M. Mumaugh, Greenwood Village, CO, and Gregory R. Piche, Denver, CO, of Holland & Hart, L.L.P., for appellants.
William M. Lamson, Jr., Omaha, and Molly M. Lukenbill, of Lamson, Dugan & Murray, L.L.P., for appellees.
HEAVICAN, C.J., WRIGHT, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.
HEAVICAN, C.J.

I. INTRODUCTION
Collette Thone and her husband, Anthony Thone, brought suit against the Regional West Medical Center (RWMC) and Drs. Glen Forney, Jeffrey Holloway, and Thomas White for alleged negligence in treating Collette Thone for complications related to a previously installed gastric band. RWMC and the physicians (collectively appellees) moved for summary judgment.
The district court granted appellees' motion on the theory that the Thones had failed to meet their requirement of providing expert testimony to support their claims. The Thones appeal, arguing that the lack of expert testimony is not fatal to their case. Because we conclude that the Thones' failure to provide expert testimony on proximate causation is fatal to their claim, we affirm the district court's grant of summary judgment.

*902 II. BACKGROUND
On approximately December 10, 2001, Collette had a gastric band installed by Drs. Holloway and Forney at RWMC in Scottsbluff, Nebraska. The gastric band limits the quantity of food that can be digested at one time and is intended to relieve a patient's obesity.
On May 16, 2002, while vacationing in Loveland, Colorado, Collette experienced severe abdominal pain and nausea, apparently caused by particles of food which were unable to pass through the band. She initially went to a local hospital, but was transferred to RWMC that same day. The parties dispute what transpired in the 5 days after Collette arrived at RWMC. It is clear, however, that on May 21, Dr. Holloway performed an exploratory laparoscopic procedure and discovered that Collette had a perforation in her stomach lining in the vicinity of the gastric band. Holloway immediately removed the gastric band and repaired the perforation. Collette was discharged from RWMC on May 30.
The Thones filed their complaint against appellees on May 14, 2004, alleging various acts of negligence by the medical center and its physicians with regard to diagnosing and treating Collette's ailments. Appellees moved for summary judgment. In support of their motion, appellees offered affidavits by Drs. Forney and White, both of whom stated that none of the named defendants had violated the applicable standard of care. The Thones' responsive evidence consisted of two affidavits: one from Collette herself and one from Collette's mother. Collette's affidavit consisted of quoted excerpts from a manual supplied by BioEnterics Corporation (BioEnterics), a manufacturer of gastric bands, immediately followed by Collette's own commentary explaining how appellees deviated from that particular instruction. A photocopy of the manual was attached to Collette's affidavit.
Appellees objected to both affidavits, and the district court sustained the objections. Finding that the Thones failed to offer any admissible evidence to support their claim of medical malpractice and that the Thones' allegations of negligence were not the sort that could be inferred without proof under the so-called common-knowledge exception, the district court granted appellees' motion for summary judgment.

III. ASSIGNMENTS OF ERROR
The Thones generally assign that the district court erred in concluding they had failed to demonstrate the existence of a triable issue of fact as to the negligence of appellees. Specifically, the Thones argue the district court erred by failing to recognize that (1) appellees' negligence was so palpable that it could be recognized by laypersons without expert proof under the common-knowledge exception and (2) the statements in Collette's affidavit and the attached BioEnterics manual provide admissible proof of appellees' negligence and thereby render expert testimony unnecessary.

IV. STANDARD OF REVIEW
Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[1]
A party makes a prima facie case that it is entitled to summary judgment by offering sufficient evidence that, assuming the evidence went uncontested at *903 trial, would entitle the party to a favorable verdict.[2] If the moving party makes such a case, the burden then shifts to the nonmoving party to produce admissible contradictory evidence which raises a genuine issue of material fact.[3] If it cannot, summary judgment should be granted.
In reviewing a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment was granted, giving that party the benefit of all reasonable inferences deducible from the evidence.[4] In conducting our review, we are mindful of the fact that on questions of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[5]

V. ANALYSIS
The overarching issue in this appeal is whether the Thones carried their burden to raise a genuine issue of material fact that appellees committed medical malpractice when treating Collette for complications involving her gastric band. In support of their motion for summary judgment, appellees offered affidavits from Drs. Forney and White, two of the named defendants. In their affidavits, the physicians offered that in their expert opinions, neither they nor any other defendant had committed medical malpractice under the applicable standard of care. Further, the physicians concluded that any acts or omissions by themselves or any other defendant did not proximately cause Collette's injuries.
At the summary judgment stage, it is well settled that such self-supporting affidavits suffice to make a prima facie case that the defendants did not commit medical malpractice.[6] As such, Forney and White's affidavits shifted the burden to the Thones to provide sufficient evidence to establish a prima facie case of medical malpractice.[7] To make such a case, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm.[8] We discuss each element in turn.

1. STANDARD OF CARE
As a general matter, expert testimony is required to identify the applicable standard of care.[9] The Thones offered no expert testimony, but they attempt to account for this fact by arguing that two exceptions make expert testimony unnecessary for several of their claims. First, the Thones argue that expert testimony is unnecessary to determine whether it was negligent for appellees to wait 5 days before treating Collette because such a delay is so plainly improper that negligence may be inferred under the common-knowledge exception. Second, the Thones argue that expert testimony is unnecessary to show that appellees were negligent in diagnosing *904 and treating Collette because an instruction manual printed by the manufacturer of Collette's medical device set the standard of care. We address each argument separately.

(a) 5-Day Delay and Common-Knowledge Exception
We have long recognized that a party can make a prima facie case of professional negligence even without expert testimony in cases where "the evidence and the circumstances are such that the recognition of the alleged negligence may be presumed to be within the comprehension of laymen."[10] This common-knowledge exception is limited to cases of extreme and obvious misconduct. Examples include failure to remove a surgical instrument from a patient's body following a procedure or amputating an incorrect limb.[11]
In contrast, we have been reluctant to apply the common-knowledge exception in cases where the alleged professional misconduct was less than obvious without some degree of technical knowledge. For example, in Fossett v. Board of Regents, a plaintiff attempted to invoke this exception by arguing that her physician was negligent for failing to remove a large amount of "bilious peritoneal fluid" which he discovered in her abdomen during an unrelated procedure.[12] We declined to apply the exception in Fossett because doing so would incorrectly assume that "the trier of fact is capable of determining whether it is accepted medical practice for a surgeon to leave bodily fluid where it is found in a patient during an operation."[13]
The Thones rely on the common-knowledge exception for their claim that appellees left Collette vomiting blood and in excruciating pain for 5 days without taking any action. Although not as extreme as leaving a surgical instrument in a patient or removing the wrong limb, a 5-day delay under such circumstances is far more akin to those scenarios than what was presented in Fossett. An authoritative treatise on medical malpractice supports this conclusion: "[N]o expert testimony is required in order to show that the failure to attend a patient altogether does not constitute reasonable care when common sense indicates that, without attention, the patient may suffer serious consequences."[14]
The Maryland Supreme Court concluded that negligence could be inferred under the common-knowledge exception when a physician failed to attend to a patient who was struck by an automobile and, although manifesting few outward indications of trauma, was therefore likely to have suffered severe internal injuries.[15] Similarly, the Louisiana Supreme Court found that an on-call physician was obviously negligent for failing to come to the hospital despite being informed that a patient had a medical emergency which required his attention.[16]
These cases support the conclusion that negligence may be inferred when a physician fails to timely attend to a *905 patient who bears serious injuries. We therefore hold that a layperson could infer that a reasonable physician, acting with the care and skill of other physicians in the community, would not neglect a patient vomiting blood and in severe abdominal pain. As such, the Thones' failure to provide expert testimony does not foreclose a finding of negligence with respect to appellees' alleged failure to promptly diagnose and treat Collette.

(b) Negligent Treatment and Manufacturer-Instruction Exception
The Thones next argue that expert testimony is unnecessary to set the standard of care for their claims that appellees were negligent in treating and diagnosing Collette's complications. The Thones contend that compliance with an instruction manual supplied by BioEnterics, the alleged manufacturer of Collette's gastric band, is itself the proper standard of care for diagnosing and treating complications related to the band. In making this argument, the Thones invoke what might, for the sake of convenience, be called the manufacturer-instruction exception to expert testimony.
On the theory that reasonable physicians do not deviate from instructions supplied by the manufacturers of drugs or devices, a number of courts hold that even without expert testimony indicating whether the instructions set the standard of care, a physician's failure to follow those instructions is prima facie evidence of negligence.[17] A minority of courts reject the idea that a manufacturer's instruction constitutes prima facie evidence of the standard of care. Instead, these courts hold that when unaccompanied by expert testimony, a manufacturer's instructions provide only "`some evidence'" of the standard.[18]
Because the Thones cannot avoid summary judgment unless they make out a prima facie case of medical malpractice,[19] the difference between these two views is significant in this case. We need not choose between these views here, however, because we conclude that the BioEnterics manual is not sufficient to trigger the manufacturer-instruction exception. Our conclusion is predicated on the fact that cases applying the manufacturer-instruction exception involved either a physician's alleged failure to follow instructions for the use of drugs[20] or a medical attendant's failure to follow specific operating instructions for basic medical instruments such as an electrosurgical mole remover,[21] a heating pad,[22] and a wound stapler.[23] In contrast, the Thones' allegations *906  and the instructions in the BioEnterics manual  primarily relate to diagnosing and treating complications involving the gastric band.
The Louisiana Court of Appeal was presented with a similar situation in Vinson v. Salmon.[24] There, a burn victim claimed that compliance with an article in a medical journal describing the proper treatment for burns was the standard of care under a Louisiana case applying the manufacturer-instruction exception. The court disagreed: "The Terrebonne[25] case involved the specific timing of a drug dosage. In contrast, the present matter involves more complex medical issues, including the appropriateness of the diagnosis and treatment provided by [the treating physician]. Thus, the cited case is not persuasive support of plaintiff's position."[26] Like the Louisiana Court of Appeal, we recognize that treating and diagnosing a patient involves a multitude of variables and extrinsic considerations which make such activities highly complex. This suggests that a physician's decisions regarding treatment and diagnosis should not be scrutinized according to a rigid set of black-letter instructions. We therefore conclude that without expert testimony, the BioEnterics manual has no bearing on the standard of care governing appellees' decisions about how to diagnose and treat Thone's ailments.
The Thones also rely on the manufacturer-instruction exception for their claim that appellees were negligent in failing to convey the BioEnterics manual's warnings about the dangers of using nonsteroidal anti-inflammatory drugs (NSAIDs) after the band was installed. The manual specifically indicates that such drugs ought to be used "with caution" because they can increase the risk that the stomach lining around the device will erode. Collette was using a prescription anti-inflammatory when she had the device installed and claims appellees knew this yet never warned her about the dangers of such use.
However, the rationale behind the manufacturer-instruction exception is that a reasonable physician would not violate a manufacturer's specific instructions when using a drug or device. Even if we were to agree that the manufacturer-instruction exception should apply in the context of patient counseling, we note that the BioEnterics manual does not specifically instruct physicians to warn patients about the risks of combining NSAIDs with gastric bands. In fact, the manual does not even instruct physicians to discontinue use of such medications; it simply advises that they be used cautiously. As a result, no reasonable argument can be made that appellees violated an explicit instruction in the BioEnterics manual by not advising Collette of the dangers of continuing to use NSAIDs.
In sum, the lack of expert testimony does not preclude the Thones from proving the standard of care with respect to their claim that appellees were negligent in waiting 5 days to treat Collette. Pursuant to the common-knowledge exception, a layperson can infer that a reasonable physician would not wait 5 days before rendering aid to a patient in Collette's condition.
However, the BioEnterics manual does not trigger the manufacturer-instruction exception in this case. As such, the lack of expert testimony proves fatal to the *907 Thones' claims that appellees committed negligence by deviating from the instructions set forth in the BioEnterics manual when attending to Collette's ailments. We therefore turn to a discussion of the other two elements of a prima facie case of medical malpractice as they relate to the Thones' delay-of-treatment claim.

2. DEVIATION FROM STANDARD OF CARE
Having concluded that expert testimony is unnecessary to prove that a reasonable physician would not leave a patient vomiting blood and languishing in pain for a period of 5 days without some care, the next issue is whether the Thones can raise a genuine issue as to whether appellees deviated from that standard of care. More precisely, the specific issue is whether the Thones provided sufficient evidence that appellees in fact failed to treat Collette for the 5-day period between May 16 and 21, 2002.
In discussing medical malpractice claims, some courts make the blanket holding that expert testimony is necessary for all three elements, including the element concerning the defendant's deviation from the standard of care.[27] Other courts are more particular and hold that "[e]xpert testimony is generally required in medical malpractice cases to establish the standard of care and to prove causation, except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience."[28] The rationale is that the standard of care and proximate causation tend to involve highly technical matters "outside the knowledge of the average person without specialized training."[29] As such, other than a situation in which the applicable standard of care or causation are sufficiently obvious that they may be inferred without proof, establishing those two elements either requires expert testimony or, in the case of the standard of care, a manufacturer's instruction. We have also indicated that a physician's own admission may suffice to establish the standard of care or proximate causation.[30]
In contrast, however, identifying a deviation from an established standard of care has the potential to be much more straightforward. In many cases, proof that the physician deviated from an established standard may require nothing more than some credible testimony from a lay witness that the physician did or did not conform to the standard. For example, in Healy v. Langdon,[31] the plaintiff, James Healy, submitted an affidavit in which he asserted that his wife's physician failed to properly inform the Healys of the risks associated with her chemotherapy. Healy had already presented evidence suggesting that a reasonable physician would have advised a patient of the risks associated with chemotherapy. Although Healy was a layperson, we held that his affidavit was sufficient to raise a genuine issue of fact as to whether the physician in fact deviated from the standard of care by not properly informing the Healys of the risks involved.[32]
*908 The result in Healy supports the conclusion that lay testimony may suffice to establish a defendant's deviation from the standard of care. We need not resolve here whether the ability to establish the deviation element with lay testimony is an exception or the norm. Instead, we simply conclude that this case presents a situation in which lay testimony alone is sufficient to show a deviation from the standard of care.
We have already established that a reasonable physician would not leave a patient in severe abdominal distress for 5 days without taking some remedial measures, absent clear justification. Identifying a deviation from this standard would require nothing more than testimony from a witness with personal knowledge as to whether appellees did in fact neglect Collette for 5 days.
As was true in Healy, it appears the only admissible evidence on this point is Collette's own affidavit in which she asserts that she was neglected by appellees during the 5-day period. Although appellees dispute this assertion, we must view the facts in a light most favorable to the Thones, the nonmoving party, by giving them the benefit of the doubt in factual disputes.[33] We hold that Collette's assertions of neglect create a genuine issue of material fact. We turn, therefore, to the third and final element of the Thones' medical malpractice claim  proximate causation.

3. PROXIMATE CAUSATION
Appellees offered expert testimony indicating that any acts or omissions of appellees were not the proximate cause of Collette's injuries. This evidence shifted the burden to the Thones to provide contrary evidence on the issue of proximate causation.[34] In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff.[35]
Expert testimony is almost always required to prove proximate causation. Nevertheless, as with the standard of care, the common-knowledge exception applies to proximate causation in professional negligence cases. Thus causation may be inferred without expert testimony if the causal link between the defendant's negligence and the plaintiff's injuries is sufficiently obvious to laypersons.[36] We note, however, that whether a causal link is sufficiently obvious that it may be inferred under the common-knowledge exception is a separate inquiry from whether a defendant's negligence is sufficiently plain that it, too, may be inferred by laypersons. As such, it does not necessarily follow that causation can be inferred pursuant to the common-knowledge exception simply because a physician's negligence might be so inferred.
Given their total lack of expert testimony in this case, the Thones can only survive summary judgment if the injuries to Collette's gastrointestinal system so obviously stem from appellees' alleged S-day delay in treating her that the causal link may be inferred even by laypersons.
*909 In addressing this question, we are persuaded by Parker v. Central Kansas Medical Center,[37] a case in which a patient who suffered injuries to her abdomen and colon during a horse riding accident sued a physician because the physician had refused to operate on her. The plaintiff in Parker asserted that, among other things, the physician's "refusal to examine, diagnose, or treat" her was obviously the cause of her injuries under the common-knowledge exception.[38] The court disagreed, noting that "without expert testimony, a jury of laypersons would not be competent to decide whether any of plaintiff's post-accident complications were caused by [the physician's] conduct or whether such complications were merely the result of her injuries sustained as a consequence of the horse riding accident."[39]
The same can be said of this case. Without expert testimony, it would be impossible for a layperson to conclude that Collette's ultimate injuries were caused specifically by a 5-day delay in treating her. There is nothing to rebut the suggestion that Collette would have suffered the same amount of harm no matter how diligent appellees had been. Therefore, despite their ability to satisfy the elements in their prima facie case concerning the standard of care and appellees' deviation from it, summary judgment was nonetheless appropriate given the Thones' lack of evidence on the issue of proximate causation.

VI. CONCLUSION
The Thones attempt to account for their lack of expert testimony on the proper standard of care by invoking the common-knowledge and manufacturer-instruction exceptions. We conclude that the BioEnterics manual does not establish the standard of care. As such, summary judgment was proper for the Thones' negligence claims based on the alleged failure to follow the manufacturer's instruction manual.
The Thones have raised a genuine question of material fact that appellees' 5-day delay in treating Collette was negligent under the common-knowledge exception. However, we nonetheless find that their failure to provide expert testimony on the issue of proximate causation is fatal to this claim. We therefore affirm the district court's summary judgment.
AFFIRMED.
CONNOLLY, J., participating on briefs.
STEPHAN, J., not participating.
GERRARD, J., concurring.
I agree with the majority regarding the general legal principles applicable to this case and with the affirmance of the district court's summary judgment. But my review of the record leads me to a different analytical framework. The majority opinion identifies the plaintiffs' two theories of recovery as (1) the "Negligent Treatment" that was allegedly inconsistent with the manufacturer's instructions and (2) the "5-Day Delay" in treatment after Collette Thone's symptoms developed. I agree with the majority that the plaintiffs did not present sufficient evidence to sustain either theory. But I reach that conclusion for different reasons.
To begin with, I find it unnecessary to address the standard of care for the "negligent treatment" claim because the record clearly establishes the plaintiffs' lack of competent evidence with respect to causation. *910 Collette's affidavit asserts that the defendants departed from the alleged "standard of care," i.e., the manufacturer's instructions for the gastric band, in several ways. In particular, the plaintiffs claim that the defendants did not warn Collette of the risks associated with the procedure or the use of anti-inflammatory drugs, did not immediately remove the band or perform an x ray after her symptoms presented, did not perform an upper gastrointestinal tract x ray (GI) preoperatively or before band inflation or adjustment, and performed her first adjustment less than 6 weeks after her operation. Collette asserted in her affidavit that "[h]ad Defendants gone in and removed the band at the onset of [her] vomiting and abdominal pain, the band could have been removed via laparoscopy, rather than cutting [her] open from the top to the bottom of her stomach."
But those are precisely the sort of conclusions that must be supported by expert medical testimony. As the majority opinion observes, causation may be inferred without expert testimony only if the causal link between the defendants' negligence and the plaintiff's injuries is sufficiently obvious to laypersons. And neither Collette nor her mother, as lay witnesses, are qualified to establish a causal link between the plaintiffs' dam-ages and any of the defendants' claimed deviations from the manufacturer's instructions. For example, a determination of whether Collette's gastric band could have been immediately removed by laparoscopy, rather than more invasive surgery, is beyond her expertise as a lay witness. Whether a preoperative GI would have prevented Collette's complications is beyond her expertise. And Collette does not aver that her decision to have the band installed, or any subsequent actions, would have been different had she been more informed of the risks associated with the procedure.
In short, there is no competent evidence in the record to rebut the defendants' evidence that their alleged deviations from the manufacturer's instructions did not proximately cause the plaintiffs' damages. And given that, I see no need to opine on the more difficult question whether the manufacturer's instructions were evidence of the standard of care.
I also have a different view with respect to the plaintiffs' claim of damages from a "5-day delay" in treating Collette's injuries. She alleged, supported by her affidavit, that she endured pain and suffering during the 5 days between May 16, 2002, when she was admitted to the hospital, and the May 21 exploratory laparotomy and removal of the gastric band. According to the majority opinion, the plaintiffs' evidence would support a finding that the defendants completely failed to treat Collette during that time and that this lack of treatment breached the standard of care.
However, I read the record differently on this issue. In particular, I do not believe that the plaintiffs presented competent evidence of a breach of the standard of care. The defendants' affidavits averred the following sequence of events:
On December 10, 2001, [Collette] underwent placement of a laparoscopic adjustable gastric band. On May 16, 2002, [she] ate some foods that would not go through the band and experienced a prolonged episode of intense esophageal spasms and retching which lasted for approximately 16 hours. She was seen in a Love land, Colorado emergency room, and then transferred to the office of Western Surgical Group. There, Dr. Holloway examined her and removed all of the fluid from her band. He then admitted her to [RWMC] with orders for her to have nothing by mouth.

*911 At RWMC, [Collette] was monitored, and given IV fluids, and pain medications. When her symptoms continued, an upper GI was performed, and reportedly indicated an obstruction at the level of the band, which appeared to have migrated distally. [Collette] was scheduled for a revision of her lap band. Due to a change in [Collette's] condition, however, Dr. Holloway instead performed a laparoscopy followed by an exploratory laparotomy on May 21, 2002. Finding that there was a gastric perforation, he removed the adjustable gastric band, and performed a partial gastric resection.
[Collette] was dismissed from the hospital on May 30, 2002. By that time, she was ambulating without difficulty, had good pain control, and was tolerating her diet well. Testing at that time revealed no evidence of any gastric leak.
Admittedly, Collette's affidavit avers, quite generally, that when she was admitted to the hospital, "[t]he Defendants waited five days before the[y] did anything." But that statement appears in her affidavit as a response to quoted sections of the manufacturer's instructions, which identify circumstances under which removal of the gastric band may be necessary. Read in context, it is obvious that the statement that the defendants "waited five days before the[y] did anything" means that despite her symptoms, the defendants waited 5 days to remove the gastric band  not that the defendants did absolutely nothing to diagnose or treat Collette while she was hospitalized.
And the plaintiffs' complaint alleges, consistent with the defendants' evidence, that Collette was admitted to the hospital on May 16, 2002, and that Dr. Holloway drained the fluid from the gastric band. (The band is placed around the stomach and inflated with sterile saline to create the proper stoma diameter, and the stoma size can be adjusted postoperatively by injecting or aspirating saline.) The plaintiffs also alleged that x rays were taken on May 19 and reviewed on May 20. In sum, the allegations in the plaintiffs' complaint are consistent with the defendants' evidence and contradict the possibility that the defendants completely failed to treat Collette during her initial 5-day hospital stay.
In short, the defendants presented evidence that when Collette presented, they deflated her gastric band and admitted her to the hospital for observation. When she did not improve, diagnostic procedures were performed and the defendants performed surgery and removed the gastric band. The plaintiffs' complaint is consistent with this account, and I do not read Collette's affidavit as contradicting it. In other words, the factual issue presented by this record is not whether the defendants completely failed to treat Collette  it is whether the defendants' treatment met the standard of care.
Therefore, it was the plaintiffs' burden to present evidence contradicting the defendants' evidence that their treatment did not breach the standard of care. More specifically, it was the plaintiffs' burden to present expert medical testimony to support a finding that the defendants' treatment fell below the standard of care. The plaintiffs' claim, essentially, is that the defendants should not have waited 5 days to remove Collette's gastric band. That claim must be supported by expert opinion. Without it, the plaintiffs did not rebut the defendants' prima facie case that they did not breach the standard of care during the 5-day span at issue.
For those reasons, I conclude that the plaintiffs failed to show a genuine issue of material fact precluding judgment as a *912 matter of law, and I concur in the judgment.
NOTES
[1] See Carruth v. State, 271 Neb. 433, 712 N.W.2d 575 (2006).
[2] See Cerny v. Longley, 270 Neb. 706, 708 N.W.2d 219 (2005).
[3] See id.
[4] See Plowman v. Pratt, 268 Neb. 466, 684 N.W.2d 28 (2004).
[5] Ichtertz v. Orthopaedic Specialists of Neb., 273 Neb. 466, 730 N.W.2d 798 (2007).
[6] See, e.g., Casey v. Levine, 261 Neb. 1, 621 N.W.2d 482 (2001); Wagner v. Pope, 247 Neb. 951, 531 N.W.2d 234 (1995).
[7] See Wagner, supra note 6.
[8] See Casey, supra note 6 (citing Neill v. Hemphill, 258 Neb. 949, 607 N.W.2d 500 (2000)).
[9] See Fossett v. Board of Regents, 258 Neb. 703, 605 N.W.2d 465 (2000).
[10] Halligan v. Cotton, 193 Neb. 331, 336, 227 N.W.2d 10, 13 (1975).
[11] Keys v. Guthmann, 267 Neb. 649, 676 N.W.2d 354 (2004).
[12] Fossett, supra note 9, 258 Neb. at 708, 605 N.W.2d at 469.
[13] Id.
[14] 1 David W. Louisell & Harold Williams, Medical Malpractice § 8.05[4] at 8-81 (2007).
[15] Thomas v. Corso, 265 Md. 84, 288 A.2d 379 (1972).
[16] Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986).
[17] See, e.g., Rodriguez v. Jackson, 118 Ariz. 13, 574 P.2d 481 (Ariz.App. 1977); Garvey v. O'Donoghue, 530 A.2d 1141 (D.C.1987); Ohligschlager v. Proctor Comm. Hosp., 55 Ill.2d 411, 303 N.E.2d 392 (1973); Terrebonne v. Floyd, 767 So.2d 758 (La.App.2000); Nolan v. Dillon, 261 Md. 516, 276 A.2d 36 (1971).
[18] Craft v. Peebles, 78 Hawai'i 287, 300, 893 P.2d 138, 151 (1995). See, Morlino v. Medical Center, 152 N.J. 563, 706 A.2d 721 (1998); Spensieri v. Lasky, 94 N.Y.2d 231, 723 N.E.2d 544, 701 N.Y.S.2d 689 (1999); Grayson v. State By and Through Children's Hosp., 838 P.2d 546 (Okla.App.1992); Ramon By and Through Ramon v. Farr, 770 P.2d 131 (Utah 1989).
[19] See Cerny, supra note 2.
[20] See, e.g., Rodriguez, supra note 17 (Streptomycin); Garvey, supra note 17 (Tobramycin); Ohligschlager, supra note 17 (Sparine).
[21] Monk v. Doctors Hospital, 403 F.2d 580 (D.C.Cir.1968).
[22] Burke v. Pearson, 259 S.C. 288, 191 S.E.2d 721 (1972).
[23] Christiana v. Sudderth, 841 So.2d 911 (La. App.2003).
[24] Vinson v. Salmon, 786 So.2d 913 (La.App. 2001).
[25] Terrebonne, supra note 17.
[26] Vinson, supra note 24, 786 So.2d at 916 (emphasis supplied).
[27] See, e.g., Travers v. District of Columbia, 672 A.2d 566 (D.C.1996).
[28] Williamson v. Amrani, 283 Kan. 227, 244, 152 P.3d 60, 72 (2007). See, also, Cox v. Jones, 470 N.W.2d 23 (Iowa 1991); Rodriguez v. Clarke, 400 Md. 39, 926 A.2d 736 (2007).
[29] Perkins v. Susan B. Allen Memorial Hosp., 36 Kan.App.2d 885, 888, 146 P.3d 1102, 1105-06 (2006).
[30] Healy v. Langdon, 245 Neb. 1, 511 N.W.2d 498 (1994).
[31] Id.
[32] See id.
[33] Plowman, supra note 4.
[34] See, Cerny, supra note 2; Casey, supra note 6.
[35] Hamilton v. Bares, 267 Neb. 816, 678 N.W.2d 74 (2004).
[36] See, McVaney v. Baird, Holm, McEachen, 237 Neb. 451, 466 N.W.2d 499 (1991); Williamson, supra note 28.
[37] Parker v. Central Kansas Medical Center, 178 F.Supp.2d 1205 (D.Kan.2001).
[38] Id. at 1214.
[39] Id.