574 P.2d 481

**Emiliano RODRIGUEZ, Appellant,**

v.

**Ralph A. JACKSON, M. D., Thomas-Davis Clinic, John H. Penners, M. D., Pima County, Clarence Robbins, M. D., and William E. Brownlee, M. D., Appellees.**

No. 2 CA–CIV 2621.

Court of Appeals of Arizona, Division 2.

Nov. 14, 1977.

Rehearing Denied Dec. 20, 1977.

Review. Denied Jan. 17, 1978.

Stuart Herzog, Tucson, for appellant.

Lesher, Kimble & Rucker, P. C. by Robert O. Lesher, Tucson, for appellees Jackson, Thomas-Davis Clinic and Penners.

Everett, Bury & Moeller, P. C. by Leonard Everett and David C. Bury, Tucson, for appellees Pima County and Robbins.

Fish, Briney, Duffield & Miller, P. C. by Richard Briney, Tucson, for appellee Brownlee.

**14**

## OPINION

HOWARD, Chief Judge.

When the alleged malpractice against a doctor requires expert testimony, can expert witnesses other than medical doctors testify as to the standard of care required of the doctor? That is the issue to be decided here.

■ Appellant filed a complaint in the superior court alleging that appellees were guilty of medical malpractice. After extensive depositions were taken, appellees moved for summary judgment. Appellant opposed the motion, relying on the affidavits of Professor Ivan M. Lytle, Dean Louis J. Kettel, Dean Gladys E. Sorensen, Diana Sims, a registered nurse, as well as the depositions of Dr. Martha Panitch, Ph.D. and appellant. All of the defendant doctors are medical specialists. Drs. Jackson and Robbins specialize in internal medicine, Dr. Brownlee is a thoracic surgeon and Dr. Penners is a radiologist. The facts shall be viewed by us in the light most favorable to appellant. *Livingston v. Citizen's Utility, Inc.*, 107 Ariz. 62, 481 P.2d 855 (1971).

Appellant was first seen by Dr. Jackson on February 15, 1967. He was brought in by his daughter-in-law because he had been experiencing insomnia and chronic nervous tension. He was given a physical examination including a blood count, a thyroid test and a chest x-ray. The radiologist, Dr. Penners, reported density and consolidations in the lungs, suspected lymph node enlargement and suspected "occupational disease". This x-ray report was sent to Dr. Jackson who contacted the daughter-in-law, advised her of the abnormality and recommended that she bring her father-in-law for follow-up. Dr. Jackson also asked the family about occupational exposure and the most he could learn was that appellant had worked as a zinc miner some ten years before; that he had not had an x-ray for twenty years and that they thought there had been one taken at the Carl Hayden Hospital. No previous chest x-rays were provided to Dr. Jackson, and the family did not bring Mr. Rodriguez back per the advice of Dr. Jackson.

The next time Dr. Jackson had occasion to see Mr. Rodriguez was on January 5, 1971. He was examined again because of the same complaint, namely insomnia. His weight was the same as it was in 1967. His lungs were clear and his heart was normal. Dr. Jackson felt that his main problem was anxiety and insomnia. He prescribed Valium.

On March 7, 1972, Mr. Rodriguez went to see Dr. Jackson, complaining of an upper respiratory infection of one month's duration. He was examined by the doctor who diagnosed the problem as bronchitis, and he was treated with oral penicillin and cough medicine.

On March 14, 1972, Mr. Rodriguez was again seen by Dr. Jackson. His respiratory symptoms had continued. A chest x-ray and skin tests were done and a sputum specimen taken. Dr. Jackson noted that the chest x-ray looked very bad and that Mr. Rodriguez appeared to have a hole in the right lung. Dr. Jackson arranged for Mr. Rodriguez to be admitted to Tucson Medical Center the next day. The admission diagnosis was "probably tuberculosis". Further tests were taken, and after consultation with Dr. Brownlee and Dr. Robbins, the Pima County tuberculosis control officer in 1972, drug therapy was commenced. Three drugs were used, among which was Streptomycin. The dosage of the Streptomycin was one gram intramuscularly twice daily. After six days of this chemotherapy, Mr. Rodriguez displayed symptoms of vestibular nerve injury and the dosage of Streptomycin was reduced to one gram per day.

Several days after Dr. Jackson began the chemotherapy, he contacted Dr. Robbins and informed him of the drug dosages he had administered, including the dosage of one gram twice daily of Streptomycin. After Mr. Rodriguez left the hospital he was treated by Dr. Robbins who continued him on one gram per day of Streptomycin for three days. On the fourth day the drug was stopped because the patient displayed signs of a vestibular nerve injury.

In May of 1972, Mr. Rodriguez was diagnosed as having vestibular dysfunction, which means that the equilibrium apparatus. involving the eighth cranial nerve was damaged. This injury is irreversible. As a result of the injury Mr. Rodriguez does not have equilibrium and there are additional visual and auditory effects such as the room spinning and noises in the air. He is subject to falling and in one such fall received a six-inch gash on his face. Had not Mr. Rodriguez been given chemotherapy, he would have died from tuberculosis.

The drug manufacturer's insert for Streptomycin sulfate stated the dosage for treating tuberculosis to be one gram daily. It also stated that Streptomycin frequently affects the vestibular branch of the auditory nerve and that the incidence of such side effect is directly proportionate to the duration of therapy and the amount of the drug administered. Dr. Jackson was aware of this side effect, but believed the dose he administered was necessary to save Mr. Rodriguez' life.

Dr. Brownlee, with whom Dr. Jackson consulted, conducted a physical examination of Mr. Rodriguez on March 17, 1972. He considered the patient's condition very serious, especially since he also apparently had silicosis and there was a possibility that he had lung cancer. Dr. Brownlee recommended that Dr. Jackson contact the county tuberculosis control officer, Dr. Robbins, and that the patient be started on Isoniazid and Myambutol, both anti-tuberculosis drugs. He was not sure whether the drug Streptomycin was discussed, although he used that drug in conjunction with the other drugs in the treatment of tuberculosis.

Dr. Robbins received a call from Dr. Jackson regarding Mr. Rodriguez and suggested treatment with Streptomycin in conjunction with two other drugs. He did not discuss dosage of Streptomycin with Dr. Jackson. The effect of Streptomycin on the vestibular function of the eighth cranial nerve was known by Dr. Robbins in 1972; however, at that time the effect of age on the use of the drug was not known to him. Dr. Robbins could find no fault in Dr. Jackson's treatment of Mr. Rodriguez including the dosage of Streptomycin given to him.

We shall now discuss the affidavits used by appellant in opposition to the motions for summary judgment. The affidavit of Ivan M. Lytle, Ph.D., discloses that he is a professor of biological sciences and head of the department of general biology at the University of Arizona. He is a physiologist by profession. Physiology is the science involving the functions of the systems of the body and is taught in medical schools and in nursing colleges. He stated that he had reviewed the medical records of Mr. Rodriguez and had made substantial review of the relevant medical literature including the literature relevant to tuberculosis prevention and treatment, the effect of Streptomycin, vestibular dysfunction and silicosis. Regarding the standard of medical care Professor Lytle stated:

"The standards of medical care applicable to the diagnosis and treatment of Mr. Rodriguez involved fundamental scientific knowledge and procedures which the defendants, as MD's, knew or should have known.

The scientific knowledge and scientific procedures involved fundamental physiological and pharmacological principles.

The diagnosis, treatment and care given to Mr. Rodriguez by the Defendants indicates that the Defendants either did not have the required scientific knowledge or did not know the required scientific procedures, or if they did know they failed to apply them.

The Defendants, therefore, violated the applicable standards of medical care . . . ."

Dr. Lytle then concluded that the defendant doctors were negligent in either their detection or treatment of the tuberculosis, and in the administration of the Streptomycin. He stated that there is rarely, if ever, any scientific justification for administering Streptomycin to an older person. Dr. Lytle also stated in his affidavit that a physician should inform the patient of the risk involved in chemotherapy.

Diana Sims is a registered nurse in charge of medical outpatients at the Arizona Medical Center in Tucson, Arizona. She stated that she had education, training and experience with regard to the diagnosis and treatment of respiratory diseases such as tuberculosis and experience in the field of pharmacology and the administration of medications. She also stated that she was familiar with the standards of medical care applicable to Mr. Rodriguez, including the standards for respiratory specialist consultants. She reviewed the records and interviewed Mr. Rodriguez and came to the conclusion that the doctors were negligent in their diagnosis, treatment and administration of drugs.

Dr. Martha Panitch, Ph.D., is a pharmacologist. Pharmacology is the science that deals with drugs, their sources, appearance, chemistry, actions and uses. Her deposition reveals that she is employed by the United States Food and Drug Administration. She has been involved in research regarding the tubercle bacillus for many years. Her job with United States government involves the evaluation of information on the actions of drugs from their therapeutic effect and safety. She relates this information to the dose and sees that the knowledge is well represented in the prescribing information commonly known as the package insert. It was her opinion that the largest dose of Streptomycin that should have been given to Mr. Rodriguez was one-half gram per day. She stated that the one-half gram per day dosage gives the maximum killing effect on the tubercle bacilli and knew of no circumstance that would justify giving two grams per day of the drug to Mr. Rodriguez. She testified that she knew the standards of medical care involved in this situation and that the doctors were negligent in their diagnosis, treatment and administration of drugs.

To support the testimony given by Diana Sims, Dr. Lytle and Dr. Panitch, appellant submitted the affidavit of Dr. Louis J. Kettel, associate dean for academic affairs at the Arizona College of Medicine, University of Arizona. He stated, inter alia:

"The standards of medical care involve scientific knowledge, proper application of that scientific knowledge and proper scientific procedures in diagnosis and treatment.

It is not necessary to be a physician to know the standards of medical care. Other health care professionals and health science professionals may know the standards of medical care also. The other persons who may know the standards of medical care may be medical scientists, such as physiologists, pharmacologists, anatomists, and other health professionals such as nurses. * * *

Physiology is taught in medical school because the practice of medicine involves the application of physiological principles in identifying normal functioning of body systems, abnormal functioning, and the procedures to correct abnormal physiological functioning. * * *

It is not necessary to have an M.D. degree or to be licensed to practice medicine in order to have the knowledge of physiology and other applicable medical subjects that may be required to evaluate patient diagnosis and treatment. A physiologist who is not a physician may have this knowledge.

Physiologists are very much involved in establishing the standards of medical knowledge that physicians should have and relevant procedures that should be followed. * * *

Essentially the same point previously made about physiology and physiologists may also be made about pharmacology and pharmacologists. * * * "

Gladys E. Sorenson, dean and professor of nursing at the College of Nursing at the University of Arizona stated in her affidavit:

" * * * Although the degree of skill and learning required of each [the doctor and the nurse] may be different, the work of both professions is based upon the same bodies of scientific knowledge and procedure and involves normal body function, the identification of abnormal function and the cause, the means of

correcting the abnormal functions and the problems involved in doing so. * *

Generally, the degree of care, skill and learning required of a physician is greater than for a nurse.

This fact, however, does not mean that a nurse does not know the standard of care relevant to a particular situation. The situation may involve knowledge and procedure that is basic to both professions.

If the situation is not a basic one, the nurse may learn the applicable standards by continued formal education, personal study and research, or work experience.

Therefore, a nurse may in fact know what may be reasonable and prudent for a physician or other health care provider to do, in a particular situation in the exercise of the degree of care, skill and learning applicable to that health care provider."

Appellant did not produce any evidence from medical doctors that the doctors were negligent.

It is appellant's position, unsupported by any relevant authority, that Lytle, Sims and Panitch, although not medical doctors, were competent to testify that the doctors failed to abide by the standards of care required of them and were negligent in their diagnosis and treatment of appellant. We do not agree.

■■■■ First, a distinction must be made between testimony as to cause and testimony relative to the standard of care required of the physician. One need not necessarily be a medical doctor in order to testify as to causation. For example, in *Benjamin v. Hot Shoppes, Inc.*, 185 A.2d 512 (D.C.Mun. App.1962), a nurse with a great deal of experience in cases involving food poisoning was competent to testify that food she had eaten had given her food poisoning. And in *People v. Cox*, 340 Ill. 111, 172 N.E. 64 (1930), a chemist was qualified to testify concerning the effects of wood alcohol in the human stomach. Thus, Dr. Panitch, the pharmacologist, was competent to testify as to the effect of Streptomycin on the eighth

cranial nerve. However, appellant's witnesses were not competent to give an opinion as to whether the doctors were negligent. Unless the conduct complained of is readily ascertainable by laymen, the standard of care must be established by medical testimony. *Kalar v. MacCollum*, 17 Ariz. App. 176, 496 P.2d 602 (1972). *Medical* testimony means testimony by physicians. In *Shea v. Phillips*, 213 Ga. 269, 98 S.E.2d 552 (1957), the court stated:

"More than twenty-three hundred years ago Aristotle, in his work on Politics, wrote: 'As a physician ought to be judged by the physician, so ought men to be judged by their peers.' And for centuries the courts of this and other countries havè, almost without exception, held that expert medical evidence is required to establish negligence respecting the service a physician or a surgeon renders his patient."

The Georgia court held that the proof ordinarily required must be given by physicians or surgeons as expert witnesses. See also, *Schueler v. Strelinger*, 43 N.J. 330, 204 A.2d 577 (1964); *Huggins v. Hicken*, 6 Utah 2d 233, 310 P.2d 523 (1957); *Malmstrom v. Olsen*, 16 Utah 2d 316, 400 P.2d 209 (1965); *Hestbeck v. Hennepin County*, 297 Minn. 419, 212 N.W.2d 361 (1973); *Watson v. United States*, 346 F.2d 52 (5th Cir. 1965); *Huttner v. MacKay*, 48 Wash.2d 378, 293 P.2d 766 (1956); Louisell & Williams, Medical Malpractice, Vol. 1, p. 203.

Appellant contends that a manual entitled "The Tuberculosis Control Program in Arizona, March 1969" constituted a written standard of care. It states that the adult dosage of Streptomycin is one-half to one gram administered intramuscularly daily for 42 to 60 days and then continued on in a one-gram dosage. Since he was administered a higher dosage of Streptomycin, appellant contends that the negligence of the doctors has been shown sufficiently to preclude the granting of summary judgment. We do not agree. The introduction to the manual states, ". . . this manual is designed to provide the practitioner as well as health departments guidelines for the

diagnosis, treatment and prevention of clinical tuberculosis." Dr. Robbins stated in his deposition that the manual was never intended to be other than a guide, and was not meant to set a standard of care the breach of which would constitute malpractice. An analogy can be made between this manual and the package insert which is required of drug manufacturers. While the package insert is admissible into evidence, it does not establish conclusive evidence of the standard or accepted practice in the use of the drug by physicians and surgeons, nor that a departure from such directions is negligence. *Salgo v. Leland-Stanford Jr. University Board of Trustees,* 154 Cal. App.2d 560, 317 P.2d 170 (1957).

Appellant's last contention is that summary judgment should not have been granted because there was a lack of informed consent in failure to provide essential information to him. In particular, he contends that when the x-ray of February 1967 indicated the presence of silicosis, Dr. Jackson and Dr. Penners owed him a duty to inform him that the silicosis made him susceptible to tuberculosis. Furthermore, he contends that when he was hospitalized for tuberculosis, the doctors failed to inform him of the dangers of Streptomycin and failed to obtain his consent to administration of the drug. We are unable to agree with appellant's contention. Whether or not a physician or surgeon has a duty to warn a patient of the possibility of a specific adverse result of the proposed treatment depends upon the circumstances of the particular case and of the general practice followed by the medical profession in such cases. *Di Filippo v. Preston,* 3 Storey 539, 53 Del. 539, 173 A.2d 333 (1961); *Riedisser v. Nelson,* 111 Ariz. 542, 534 P.2d 1052 (1975); *Morrell v. St. Luke's Medical Center,* 27 Ariz.App. 486, 556 P.2d 334 (1976). Appellant presented no testimony by a medical doctor as to the custom of the medical profession relative to these warnings. He had ample time to find the required testimony and summary judgment was proper.

Affirmed.

STEVENS, J., and JACK T. ARNOLD, Superior Court Judge, concur.

NOTE: JAMES D. HATHAWAY and JAMES L. RICHMOND, JJ., having requested that they be relieved from consideration of this matter, HENRY S. STEVENS and JACK T. ARNOLD, JJ., were called to sit in their stead and participate in the determination of this decision.